## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 26 2019, 6:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Dorothy Ferguson
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of:
A.J., T.M., E.M. *(Minor Children)*

and

T.M. *(Mother)*,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner,*

November 26, 2019

Court of Appeals Case No.
19A-JT-814

Appeal from the Madison Circuit Court

The Honorable G. George Pancol, Judge

Trial Court Cause Nos.
48C02-1808-JT-162
48C02-1808-JT-163
48C02-1808-JT-164

**Robb, Judge.**

# Case Summary and Issue

[1] T.M. ("Mother") appeals the termination of her parental rights to three of her children and presents the sole issue of whether the juvenile court's order terminating her parental rights was clearly erroneous. Concluding it was not clearly erroneous, we affirm.

# Facts and Procedural History

[2] Mother has four children, three of whom are the subject of this appeal: A.M., born July 20, 2007; T.M., born July 4, 2013; and E.M., born February 10, 2015 (collectively "Children").[1]

[3] On or about February 11, 2015, the Department of Child Services ("DCS") received a report alleging that the Children were the victims of neglect because Mother tested positive for cocaine upon her admission to the hospital to give birth to E.M. and Mother admitted to "dealing and cooking" drugs. Appellant's Amended Appendix, Volume V at 117. DCS Family Case Manager ("FCM") Kelli Hoffman met with Mother at the hospital and Mother agreed to participate in an informal adjustment. However, before signing the agreement, Mother fled her home and DCS was unable to locate her. On February 25, 2015, DCS received a second report alleging the Children were the

---

[1] The parental rights of T.M. and A.M.'s biological fathers were also terminated; however, neither father participates in this appeal and we have limited our recitation of the facts to those pertaining only to Mother. The record also reveals that E.M.'s father signed a consent for E.M. to be adopted.

victims of neglect because Mother was found unconscious in a local hotel room under the influence of drugs, with her Children present. A "crack pipe," oxycodone, and Klonopin were found in the hotel room. *Id*. The next day, DCS received the results from E.M.'s meconium test which was positive for cocaine. The Children were removed from Mother's care and placed with their maternal aunt, P.M.

[4] On February 27, 2015, DCS filed its Verified Petition Alleging the Children were Children in Need of Services (CHINS).[2] The juvenile court held a fact-finding hearing on the CHINS petition, during which Mother admitted the Children were CHINS; that her youngest child, E.M., had been born exposed to illegal substances; and that she could benefit from substance abuse treatment. The juvenile court found the Children to be CHINS. On June 24, 2015, the juvenile court held a dispositional hearing and entered a dispositional decree in which Mother was required to (among other things): complete a substance abuse evaluation; participate in home-based casework services; maintain contact with DCS; complete scheduled visitations and comply with visitation procedures; obey the law; refrain from consuming alcohol; not use, manufacture, trade, distribute, or sell any illegal substance; take only current and valid medications prescribed to her in the proper dose and frequencies

---

[2] DCS filed separate petitions alleging that each of the Children were CHINS; however, the allegations in each petition were identical. Similarly, the findings of fact and conclusions thereon in the juvenile court's termination orders are identical. This court ordered the matters to be consolidated for appeal. Accordingly, our recitation of the facts and procedural history is applicable to each of the Children at issue in this appeal unless otherwise stated.

specified; submit to random drug screens; secure and maintain suitable housing and a stable source of income; attend AA/NA regularly and provide attendance verification; attend all scheduled medical and mental health appointments and follow all recommendations; and comply with the terms of her probation. *See id.* at 22-23.

[5] At the time DCS became involved in this matter, Mother was on probation for a 2010 operating while intoxicated conviction. Mother was arrested in September 2015 for violating the terms of her probation. In December 2015, the juvenile court held a review hearing and found that Mother had not participated in services due to her incarceration. Mother was released from the correctional facility in April 2016 and completed a re-entry substance abuse assessment but failed to comply with the recommended treatment options. At the June 2016 permanency hearing, the juvenile court found that Mother has failed to "substantially compl[y] with home-based services and visitation." Appellant's Amended App., Vol. IV at 187.

[6] On August 1, 2016, DCS filed a three-month progress report, stating that Mother had been compliant with her intensive outpatient program ("IOP") classes and she had been consistently meeting with her home-based caseworker since April 2016. However, Mother had tested positive for cocaine and Tramadol on July 27, 2016. *See id.* at 179. Following a review hearing in December 2016, the juvenile court found that prior to incarceration, Mother's visitation with the Children was "very sporadic and inconsistent" and since being released, Mother has failed to exercise visitation on a "consistent and

routine basis." *Id.* at 146. Mother complied with services from December 2016 until April/May 2017, when she was closed out of her substance abuse treatment, home-based casework, and random drug screens due to her non-compliance.

[7] On June 21, 2017, the juvenile court issued an order approving a permanency plan for the Children, namely reunification with a concurrent plan of adoption. *See id.* at 109. On December 13, 2017, the juvenile court found that Mother had been non-compliant with services, refused to comply with drug screens, and "severed all contact" with DCS. *Id.* at 40. It also found that Mother had active warrants for her alleged participation in a robbery and was "currently a fugitive from justice." *Id.* The juvenile court subsequently appointed a Court Appointed Special Advocate ("CASA") for the Children.

[8] On August 31, 2018, DCS filed separate verified petitions for involuntary termination of Mother's parental rights to each of her Children. Due to Mother's two recent Level 3 felony charges for aiding and inducing armed robbery, she violated a condition of her probation and was incarcerated in October 2018. The juvenile court held a fact-finding hearing on November 29 and December 4, 2018. At the hearing, Mother testified that she completed inpatient treatment and had been sober since July 2018. Following the hearing, the juvenile court granted DCS' petition to terminate Mother's parental rights as to the Children and found, in relevant part:

> [21)]e. Mother states that she has been sober since completing
> inpatient treatment at a hospital she could not identify in July

2018. She claims to have been in treatment with Clean Slate prior to her recent incarceration, but presents no evidence to the Court of either her treatment or of any clean drug screens and failed to notify DCS of any such treatment. Mother cites her most recent incarceration as preventing her from obtaining these records but, by her own admission, she was not incarcerated until October 13, 2018, three (3) months since her alleged release from inpatient treatment, and had not even informed her attorney of the existence of these records until a week before the December 4, 2018 hearing. The same refusal to cooperate with DCS that has hindered Mother's progress throughout this case hinders her from presenting credible evidence of her claimed sobriety. Even if, as Mother claims, she sought treatment on her own in July and managed to remain sober for the few months before her incarceration, that would not be dispositive of this case, as it fits clearly within a pattern of her beginning treatment only to disappear for extended periods without contact until overtaken by another problem, such as her repeated criminal entanglements.

* * *

k.      Mother's assertions that she was ready to take the [C]hildren if she were released from incarceration were contradicted by her own admissions that she has no source of income to support the [C]hildren and no employment prospects.

l.      . . . Mother has failed to participate faithfully in services designed to help her deal with her substance abuse and mental health issues and achieve reunification. She was consistently and repeatedly closed out of services and what little progress she did make in services was frequently interrupted by her multiple incarcerations during the life of the CHINS case.

m.     Throughout her testimony, Mother attempted to minimize her negative behaviors and her own role in the failure to achieve reunification with her [C]hildren.  Mother contested that she was only sleeping when she was discovered in the hotel room in 2015 under the influence of multiple substances.  Mother blamed her sister for her most recent arrest, while at the same time stating that she expected this same person to provide for her [C]hildren if Mother were to remain incarcerated.  Mother appears not to appreciate the impact her behaviors have on those closest to her, including her [C]hildren and her sister.

Appealed Order at 13-15, 33-34, 54-56.[3]  Based on these findings, the juvenile court made the following conclusions:

[28)]a.  Mother has failed to faithfully participate in services designed to remedy the CHINS conditions which necessitated the coercive intervention of the Court and to enable the family's reunification.  Mother was offered no less than six (6) opportunities to remedy her substance abuse problems but failed to complete the assessment or recommended treatment every time.  Mother was offered home-based casework to enhance her ability to participate in that substance abuse treatment but failed to put in even minimal effort to participate in those services.

b.     Mother has an extensive history of substance abuse, the principal reason that the Child[ren were] placed outside of Mother's care.  She claims that she has achieved sobriety but has evaded all efforts to verify that claim.  In light of Mother's continued evasion of DCS even while she claimed to be making progress towards sobriety and reunification and her inability to provide any evidence to support her claims, the Court finds those

---

[3] Although the trial court issued three separate orders, the orders are identical with respect to the trial court's findings and conclusions about Mother.  Therefore, we have quoted from only one order.

claims have little credibility. Even if . . . Mother's claims are taken at face value, however, at best they demonstrate that she managed only three (3) months of sobriety on her own before being incarcerated yet again. This would be only the latest example of Mother's criminal entanglements disrupting her ability to participate in services, visit with the Child[ren], or otherwise make any progress towards reunification for the entire three and a half years of the CHINS case.

c.      Mother cannot provide necessary housing or support for herself or her [C]hildren. Mother admitted that she has no means of supporting them while incarcerated and, even if Mother were to be acquitted of her pending criminal charges and released from incarceration at her earliest possible release date, she has no housing of her own, has had no documented employment for the entirety of the CHINS proceedings, and admitted to having no known prospects for employment.

d.      After three and a half years, Mother continues to expect others to take responsibility for supporting her and her [C]hildren and accepts no consequence for repeatedly failing to take that responsibility upon herself. Mother expects her sister to continue raising her [C]hildren even after her sister testified that she felt Mother had not appreciated her efforts and stated that she supported termination of Mother's parental rights. Mother was closed out of visitation services and rebuffed DCS's attempts to coordinate a visitation schedule but still expected her sister to allow visitation whenever it was convenient for herself. Mother's apparent indifference for the impact of her behaviors on those around her and her inability or unwillingness to take on the responsibility for parental care is proof that there is no likelihood that the conditions which necessitated the [C]hild[ren]'s removal will be remedied.

* * *

29)     [T]here is a reasonable probability that the reasons for placement outside Mother['s] home will not be remedied.

30)     [T]here is a reasonable probability that the continuation of the parent-child relationship between Mother and the Child[ren] poses a threat to the well-being of the Child[ren].

* * *

32)     The DCS [FCM] and the Child[ren]'s CASA have both testified that termination of Mother['s] . . . parental rights is in the Child[ren]'s best interests, and the Court accepts and adopts . . . them as its own finding of fact in these proceedings.

33)     [T]here is a satisfactory plan for the care and treatment of the Child[ren], namely . . . adoption[.]

*Id.* at 18-20, 37-38, 59-60.[4]  Mother now appeals.  Additional facts will be supplied as necessary.

# Discussion and Decision

## I.  Standard of Review

The Fourteenth Amendment of the United States Constitution protects a parent's right to raise his or her children.  *In re D.D.*, 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), *trans. denied*.  Although "[a] parent's interest in the care,

---

[4] We thank the juvenile court for its thorough and extensive findings of fact and conclusions thereon that have aided in our review of this matter.

custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests[,]'" parental interests are not absolute and "must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Thus, the parent-child relationship may be terminated when a parent is unable or unwilling to meet their parental obligations. *Id.* And a juvenile court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating parental rights. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). We are cognizant that involuntary termination of parental rights is the most severe sanction a court can impose because it severs all rights of a parent to his or her child. *Matter of D.G.*, 702 N.E.2d 777, 780-81 (Ind. Ct. App. 1998). Therefore, termination is considered a last resort, "available only when all other reasonable efforts have failed." *Id.* at 781.

[10] Given the juvenile court's unique position, we review the termination of parental rights with great deference. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). We do not reweigh the evidence or judge the credibility of the witnesses. *Bester*, 839 N.E.2d at 147. Instead, we consider the evidence and reasonable inferences most favorable to the juvenile court's judgment. *Id.* We will set aside the trial court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App.

1999), *trans. denied*, *cert. denied*, 534 U.S. 1161 (2002). Thus, if the evidence and inferences support the decision, we must affirm. *Id*.

[11] Where, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings, then whether the findings support the judgment. *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015). "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id*.

## II. Statutory Requirements for Termination

[12] To terminate the parent-child relationship, DCS must prove by clear and convincing evidence:

> (B) that *one* (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

\* \* \*

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (emphasis added); *see also* Ind. Code § 31-37-14-2 ("A finding in a proceeding to terminate parental rights must be based upon clear and convincing evidence."). "[I]f the court finds that the allegations in a petition described [above] are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added).

## A. Remedy of Conditions

[13] Mother first argues that the State failed to prove that the conditions that led to the Children's removal and continued placement outside of her care "could not be remedied in a reasonable amount of time where [she] completed substance abuse treatment and has maintained sobriety since July of 2018." Appellant's Brief at 9.

[14] In determining whether a reasonable probability exists that the reasons for removal or placement outside the home will not be remedied, we engage in a two-step analysis. *K.E.*, 39 N.E.3d 641 at 647. First, we identify the conditions that led to removal and then, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* With respect to the second step,

the [juvenile] court must judge a parent's fitness to care for her child at the time of the termination hearing, taking into consideration evidence of changed conditions. The [juvenile] court must also evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. Pursuant to this rule, courts have properly considered evidence of a parent's criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. The [juvenile] court may also properly consider the services offered to the parent by [DCS] and the parent's response to those services as evidence of whether conditions will be remedied. Finally, [DCS] is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change.

*In re I.A.,* 903 N.E.2d 146, 153 (Ind. Ct. App. 2009) (citations and emphasis omitted).

[15] Here, there is no dispute that the conditions that led to the Children's removal and their continued placement outside of Mother's care are related to Mother's substance abuse issues and criminal history of substance abuse related offenses. Specifically, E.M., Mother's newborn, tested positive for cocaine at birth, and Mother was found unconscious and under the influence of illegal substances in a hotel room with the Children present and otherwise unsupervised. The juvenile court found that Mother has an "extensive history of substance abuse" and concluded that there was a reasonable probability that these conditions will not be remedied. Appealed Order at 19. Mother maintains that she made the decision to enter an inpatient rehabilitation program "to get clean for herself[,]" which demonstrates an "improved insight into her substance abuse issue."

Appellant's Br. at 12. Mother appears to argue that because she has allegedly been sober since July 2018, the only basis for the termination of her parental rights was her current incarceration.

[16] We first acknowledge that our supreme court has held that incarceration itself is an insufficient basis for terminating parental rights. *In re G.Y.*, 904 N.E.2d 1257,1264-66 (Ind. 2009). However, contrary to Mother's assertions, her recent incarceration was not the sole basis for terminating her parental rights.

[17] At the fact-finding hearing, Mother testified that she sought inpatient substance abuse treatment at Fairbanks in mid-July 2018 and then went to another facility for longer treatment. Before she was incarcerated in October 2018, Mother claimed that she had been attending Clean Slate and she had received negative drug screen results but had not yet provided a release allowing DCS to obtain those results. FCM Annette Lehman stated that Mother had not had any drug screens since summer 2017 and therefore, she was unable to verify Mother's alleged recent sobriety. Although Mother argues that she has remedied her substance abuse issues, the juvenile court found that even if Mother has completed an inpatient program and maintained sobriety in the few months prior to her incarceration, as Mother claims, "that would not be dispositive of this case, as it fits clearly within a pattern of [Mother] beginning treatment only to disappear for extended periods without contact until overtaken by another problem, such as her repeated criminal entanglements." Appealed Order at 13. The record establishes a clear pattern of Mother's struggle with addiction and

other substance abuse related issues, as well as her failure to participate in services to remedy her addiction as required by the dispositional decree.

[18] DCS initially became involved in this case because Mother's newborn tested positive for cocaine and Mother was later found unresponsive in a hotel room under the influence of drugs with her Children present. At this time, Mother was already on probation for a prior operating while intoxicated conviction. Although Mother completed an assessment, she was subsequently incarcerated from September 2015 to April 2016. Following her release, Mother completed a re-entry substance abuse assessment, which recommended that she participate in an IOP for which she was placed on a waitlist. On May 2 and 3, 2016, Mother tested positive for cocaine; on May 25, she tested positive for THC; on June 3 and 14, she tested positive for Suboxone, which had been prescribed to her; and also on June 3, she tested positive for Phenobarbital, which had not been prescribed. *See* Appellant's Amended App., Vol. IV at 170. Services were closed out in August 2016 due to Mother's non-cooperation with services. In December 2016, Mother began participating in substance abuse treatment, home-based casework, and drug screens. However, Mother stopped complying with services in April/May 2017, and the services were closed out. Mother was subsequently charged with two Level 3 felonies for her alleged participation in an armed robbery that occurred in July 2017. Mother had active warrants for her arrest, became unreachable, and was ultimately arrested in October 2018. Mother will be incarcerated for nine months for another probation violation due to the new charges.

[19] FCM Lehman testified that she had been assigned to this case for approximately three years and initially became involved because Mother's substance abuse issues raised safety concerns for the Children. Lehman testified that Mother did not fully complete home-based services. She made six substance abuse assessment referrals for Mother in April, June, and August 2015, April, June, and December 2016. She testified that Mother completed the August 2015 evaluation but then failed to return for recommended treatment, and in December 2016, Mother did another assessment and was compliant until March/April 2017 when Mother had hernia surgery. Following her surgery, Mother failed to comply, and the referral was closed out due to her non-compliance. Since that time, Lehman stated that Mother "became pretty unobtainable to find [since] she was basically on the run due to [the robbery] warrants." Transcript, Volume I at 39.

[20] Megan Wills, a home-based case worker, received a referral for Mother in June/July 2016 and provided services until August 2016. Wills testified, "[W]e had been working together for about a month pretty consistently and then [Mother] stopped communicating with me after that." Id. at 82. Due to Mother's non-compliance, Wills closed out services. Wills stated that she would have liked to see Mother obtain and maintain stability and sobriety and her "biggest concern [with Mother] was just the substance abuse at the time and then she had some criminal charges[.]" Id. Ultimately, Wills testified that she did not believe that Mother's participation in the services she had provided resolved any concerns about Mother's ability to care for the Children. In fact,

she stated, "I don't think we worked together long enough for [Mother] to make any big chan[g]es during that time." *Id.* at 84.

[21] As our supreme court has explained, the juvenile court must determine a parent's fitness at the time of the termination proceeding "taking into consideration evidence of changed conditions – balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quotation and internal citation omitted). This "delicate balance" is entrusted to the juvenile court, which has the discretion to "weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id.* In fact, "[r]equiring [juvenile] courts to give due regard to changed conditions *does not* preclude them from finding that a parents' past behavior is the best predictor of their future behavior." *Id.* (emphasis added).

[22] In this case, the juvenile court judged the credibility of the witnesses, weighed Mother's alleged recent sobriety with her past behavior of addiction related issues, and determined that Mother's non-compliance, extensive substance abuse and related issues, and pattern of disappearing was the best predictor of her future behavior – concluding that there was a reasonable probability that Mother's behavior will not change. *See* Appealed Order at 18-20. The juvenile court was well within its discretion to so find and Mother's argument otherwise constitutes an improper invitation for this court to reweigh the evidence, which we cannot do. *Bester*, 839 N.E.2d at 147. We conclude that DCS proved by

clear and convincing evidence that there is a reasonable probability that the conditions resulting in the Children's removal will not be remedied.[5]

## B. Best Interests

[23] Mother challenges the juvenile court's conclusion that termination of her parental rights is in the best interests of the Children. Mother argues that, although she has made poor choices, she has been consistently present in the Children's lives and the Children have not suffered any adverse effects as a result of her incarcerations.

[24] To determine the best interests of the Children, the juvenile court looks to the totality of the evidence and must subordinate the interests of the parents to those of the children. *In re D.D.*, 804 N.E.2d at 267. "A child's need for permanency is an important consideration in determining the best interests of a child[.]" *In re D.L.*, 814 N.E.2d 1022, 1030 (Ind. Ct. App. 2004), *trans. denied*. The juvenile court need not wait until a child is irreversibly harmed before terminating parental rights. *McBride*, 798 N.E.2d at 203. This court has held that the recommendation of the FCM and CASA, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show

---

[5] The juvenile court found that DCS proved both that there was a reasonable probability that the conditions, namely Mother's substance abuse issues, that led to the Children's removal and continued placement outside her care will not be remedied, and that the continuation of the parent-child relationship poses a threat to the safety and well-being of the Children. Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the juvenile court is only required to find that *one* of the elements of subsection (b)(2)(B) is established by clear and convincing evidence. *In re I.A.*, 903 N.E.2d at 153. Therefore, we need not address Mother's argument as it pertains to section (b)(2)(B)(ii).

by clear and convincing evidence that termination is in the child's best interest. *In re A.S.*, 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[25]     In this case, both the FCM and CASA testified at the fact-finding hearing that termination of Mother's parental rights was in the Children's best interests, and we have already concluded there is evidence that the conditions that led to the Children's removal will not be remedied. FCM Lehman testified:

> I believe [Mother] has some definite substance abuse concerns that have yet to be addressed throughout the case as well as I think just ongoing even prior to our involvement as well as the fact that she has these pending legal issues that could in another way take her away from the [C]hildren's life for a significant amount of time. [T]hese [C]hildren are at this point almost four, five and eleven so I definitely think they need a safe and stable environment for where they are cared for on a daily basis and I don't believe at this point [Mother] can provide that. [F]urthermore, we've been involved with this case for four years almost, so I feel like [the Children] just need that permanency. They need that stability and they can't get it with [Mother.]

Tr., Vol. I at 47. CASA Jan Shryock testified that Mother "hasn't been a very stable influence in the [C]hildren's lives[.]" *Id*. at 118. She also stated that even if Mother was released from detention today, reunification with her Children would not be in their best interests. *See id*. at 119. In light of this testimony, the juvenile court's conclusion that termination of Mother's parental rights was in the Children's best interests is supported by clear and convincing evidence. *See In re A.S.*, 17 N.E.3d at 1005.

# Conclusion

For the reasons set forth above, we conclude that DCS presented clear and convincing evidence that there is a reasonable probability that the conditions that led to the Children's removal from Mother's care will not be remedied and that termination of Mother's parental rights is in the Children's best interests. As such, the juvenile court's order terminating Mother's parental rights as to the Children was not clearly erroneous. Accordingly, we affirm.

Affirmed.

Mathias, J., and Pyle, J., concur.